UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------------------------------------ X
MICHAEL GARGANO and ANDREA GARGANO,

    Plaintiffs

  - against -

METRO-NORTH COMMUTER RAILROAD COMPANY,

    Defendant/Third-Party Plaintiff,

  - against -

DUCCI ELECTRICAL CONTRACTORS, INC.,

    Third-Party Defendant.
------------------------------------------------------------------ X

Civil Action No.
3:00 CV 1477 (EBB)

October 12, 2004

### DEFENDANT/THIRD PARTY PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF OPPOSITION TO THIRD PARTY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant/Third Party Plaintiff Metro-North Commuter Railroad Company ("Metro-North") hereby opposes Third Party Defendant Ducci Electrical Contractors, Inc.'s ("Ducci") Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 (b) and Local Rule 56 (a). Ducci is not entitled to summary judgment because it relies on inapplicable law and ignores critical issues of material fact.

**I.     FACTS AND PROCEDURAL HISTORY**

This action involves injuries allegedly sustained by plaintiff, a then 36 year-old electrician for Ducci Electrical Contractors Inc. ("Ducci"), while working from a manlift on Track 4 east of

379928.1 DocsNY

the New Haven Station in New Haven, CT on July 22, 1999 at approximately 3:33 p.m. when he came into contact with the energized overhead catenary wire. Plaintiff was working on the New Haven Interlocking Reconfiguration Project ("Project"). [2]

On July 22, 1999, plaintiff was working on a manlift at Track 4 at catenary bridge No. 1098 correcting Track 4 catenary "punch list" items when he and/or his equipment came into contact with the Track 2 side of the 4-2 crossover Kupler section insulator which had been re-energized by Metro-North Power Control in New York.[3] A clearance[4] for Track 4, which was under construction as part of the project, had been in effect since May 17, 1999. According to Metro-North form MP-260, Employee Clearance Form No. 3534, a clearance had been issued for Track 2 east of catenary bridge no. 1098 at 9:26 a.m on July 22, 1999 to allow several Ducci

---

[2] The terms of the Project are contained in the Agreement Between CT Dept. of Transportation and National Railroad Passenger Corporation for the Construction of New Haven Interlocking Reconfiguration at New Haven, CT, Agreement No. 01.17-01 (96), dated May 31, 1996. A copy of which is annexed as Exhibit A. In addition, the subcontract between CDOT and Ducci is annexed in Ducci's moving papers as Ex. B.

[3] The 42 crossover Kupler section insulator separates tracks 2 and 4. Therefore, the area east of the insulator on the track 2 side was energized whereas the area west of the insulator on track 4 was de-energized.

[4] Clearance is permission to work on a particular track or section of track. It is authorization to take a track out of service preventing electrification of the overhead catenary or third rail as well as placing a "plate" or block on the movement of trains. The process is twofold. After receiving the request from the field, the Power Director must contact Rail Traffic Control for permission to de-energize a track section. If permission is granted a "plate" is put into effect by Rail Traffic Control preventing the movement of trains or equipment on that section of track. The Power Director then opens the circuit and de-energizes the track section giving the field a clearance to work.

gangs to work in the area. This clearance was removed, and Track 2 was re-energized at 3:31 p.m. by Metro-North Class "A" Lineman Robert Prentice. Mr. Prentice released his clearance on Track 2 to Power Control in New York after Ducci General Foreman Phil Morse advised that all his men were aware that Track 2 was being re-energized and were in the clear.

In his complaint, plaintiff alleges that Metro-North failed to maintain a safe workplace, failed to keep a reasonable and proper lookout in the immediate vicinity of the re-energized overhead catenary lines, failed to warn plaintiff that the overhead catenary was re-energized and finally that despite receiving an indication that there was a short circuit they negligently attempted to again re-energize the overhead catenary lines without first contacting the New Haven Station following the initial short circuit. Therefore, plaintiff alleges that he received two separate electrical shocks from 13,000 volts of electricity.

Metro-North's third-party action alleges a claim for: 1) common law indemnification; 2) contractual indemnification based on Ducci's breach of the indemnification/hold harmless agreement in the contract between CDOT and Ducci; and 3) contractual indemnification based upon Ducci's breach of the insurance procurement agreement in the contract between CDOT and Ducci. (See Metro-North's Ex. B, Amended Third-Party Complaint, dated October 24, 2001). The contract between CDOT and Ducci mirrored the main contract between National Railroad Passenger Corporation ("Amtrak") and CDOT which obligates CDOT and its subcontractors, such as Ducci to obtain liability insurance which (1) names, inter alia, CDOT, Amtrak and

Metro-North as additional insureds, (2) contains a provision that the insurer agree to defend and indemnify the insureds against all claims for damages, and (3) has limits of not less than $25 million "per occurrence, contained single limit for bodily injury (including disease or death), personal injury and property damage (including loss of use) liability." (See Ex. A, Section K. Indemnification - Liabilities). Although Metro-North was not a direct party to the contract between CDOT and Ducci, it was clearly an intended 3rd party beneficiary of the contract and is therefore entitled to enforce Ducci's contractual obligations to provide indemnification as a result of the injury to plaintiff.[5]

## II.   LEGAL ARGUMENT

"[S]ummary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party seeking summary judgment has the burden of showing the absence of any genuine issue [of] material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law . . . and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact." *Barrett*

---

[5] There is also a pending declaratory judgment action, *National Surety Corp. v. Steadfast Ins. Co., National Railroad Passenger Corp. d/b/a Amtrak and Metro-North,* currently before U.S. District Judge Eginton.

*v. Montesano*, 269 Conn. 787, 791-92, 849 A.2d 839 (2004) (internal citations omitted). In this case, Ducci has not satisfied this high burden of proof and, therefore, is not entitled to summary judgment.

### A. Breach of Contract Claims
### 1. Ducci breached its obligation under the sub-contract to defend, indemnify and hold harmless Metro-North

Ducci first argues that summary judgment should be granted with regard to the first cause of action because Ducci was not obligated to defend, indemnify or hold harmless Metro-North under the terms of the sub-contract. Ducci was bound by the terms of the Metro-North/Connecticut Department of Transportation ("CDOT") primary contract, however, and therefore breached its sub-contract when it failed to comply.

Pursuant to the primary contract between Metro-North and CDOT, all sub-contractors to the agreement were subject to the following terms:

> With respect any work CDOT has performed by contractors, CDOT will require such contractors to carry for the duration of this Agreement and any supplements thereto, with AMTRAK and CDOT being named as additional insured parties, the insurance coverages provided under Exhibit C. Said coverages are to be provided by an insurance company or companies satisfactory to CDOT and AMTRAK. Each insurance policy shall state that the insurance company shall agree to investigate, indemnify and defend the insureds[6], CDOT and AMTRAK, against all claims for damages, even if groundless.

(See Ex. A, p. 6, B1.)

---

[6] Metro-North is an additional insured pursuant to the contract between Ducci and CDOT as admitted in Ducci Ex. F, Donovan Letter, dated August 4, 1997.

The agreement entered into between Ducci and CDOT was a sub-contract subject to the terms and conditions of the primary agreement. In the sub-contract, Ducci agreed to be bound by those terms. (See Ducci Ex. B, Article 1.03.07 of the original contract in conjunction with Ducci Ex. F, Donovan Letter, dated August 4, 1997. Because Ducci, and its purported insurance carrier(s), have refused to defend, indemnify and hold harmless Metro-North for the injuries sustained by the plaintiff, Ducci has breached its sub-contract with Metro-North and is therefore not entitled to summary judgment as to the first cause of action.

### 2. **Ducci breached its sub-contract with Metro-North because it did not procure the requisite $25 million in general liability insurance**

Ducci seeks summary judgment with regard to the second cause of action alleging that Ducci breached the sub-contract by failing to obtain the requisite $25 million in general liability insurance. In its memorandum of law in support of its motion, Ducci merely provides an ambiguous recitation of the contractual history and fails to so much address the fact that it procured *only $1 million* in general liability insurance.

The amended sub-contract provides in relevant part:

General Liability Insurance.

> A policy issued to and covering liability imposed upon the contractor with respect to all work to be performed and all obligations assumed by the Contract or under the terms of this Contract. Products, completed operations, independent Contractors, and contractual liability coverages are to be included and all railroad exclusions are to be deleted.

> Amtrak, CDOT, Metro-North, MTA, Conrail, Providence and Worcester

> are to be named as an additional insureds with respect to operations to be performed . . . . Coverage under this policy, or policies, shall have limits of liability of not less than $25 million per occurrence, combined single limit for bodily injury . . ., personal injury and property damage . . . .
>
> The insurance, hereinbefore specified, shall be carried until all work required to be performed under the terms of the contract is satisfactorily completed and formally accepted. Failure to carry or keep such insurance in force until all work is satisfactorily completed shall constitute a violation of the contract.

(Ducci's Ex. F., p. 33.) Despite Ducci's unequivocal commitment to provide $25 million in *general liability insurance*, Ducci instead provided $1 million in general liability insurance and a $24 million *umbrella policy*.

General liability insurance coverage and umbrella coverage are not synonymous. *See e.g., Schilberg Integrated Metals Corp. v. Continental Casualty Co.*, 263 Conn. 245, 248, 819 A.2d 773 (2003) (court references "three types of insurance coverage: comprehensive general liability coverage; umbrella coverage; and excess coverage"). Unless the $24 million umbrella policy is applied on a primary basis, Ducci will only be "on the hook" for the first $1 million in general liability coverage. This is clearly not the scenario contracted for by the parties. Based on the aforementioned provision, the first $25 million needed to satisfy any and all covered claims should be satisfied by Ducci's general liability policies. As it stands now, however, Ducci's general liability policy will only cover the first $1 million in coverage before the burden for the next $10 million falls on Metro-North's insurer. The sub-contract clearly required $25 million in *general liability insurance – not umbrella coverage –* which Ducci did not procure.

Even if Ducci's umbrella policy were to provide primary coverage, it is uncertain whether the rest of the policy complies with the terms of the sub-contract. Despite requests by Metro-North, Ducci has yet to allow Metro-North to view the umbrella policy. Moreover, Ducci has not complied with F.R.C.P. Rule 26 (a) (1) (D) by failing to disclose all insurance agreements. (See Ex. C, Kane Letter, dated September 30, 2004) Therefore, Ducci has not demonstrated that it did not breach the sub-contract. If the umbrella policy only provides coverage to Metro-North for vicarious liability rather than its own negligence, for example, then the policy is not as broad as is required by the sub-contract and Ducci will be in breach of the sub-contract. Ducci, therefore, is not entitled to summary judgment as to this cause of action.

### 3. Ducci breached its sub-contract with Metro-North because it did not procure liability insurance covering Metro-North as an additional insured for its own acts of negligence

Ducci seeks summary judgment with regard to the third cause of action because it allegedly combines and repeats the first two causes of action. The third cause of action, however, sets forth a separate and distinct contractual breach – specifically that Ducci did not obtain the requisite coverage for Metro-North as an additional insured for both its vicarious liability *and* for any acts of its own negligence. As set forth in sub-section A (2), Ducci has failed to provide Metro-North, or this Court, with a copy of the umbrella policy. Without providing Metro-North and this Court with the additional insured clause contained therein, Ducci cannot establish that it did not breach the sub-contract. Summary judgment is therefore

inappropriate on this cause of action.

### B.   Metro-North's Claims in Negligence and for Contribution are not Barred by the Exclusive-Remedy Clause of the Workers' Compensation Act

#### 1.   Negligence

Ducci argues that Metro-North's fourth cause of action sounding in negligence is barred by the exclusive-remedy clause of the Workers' Compensation Act.[7] Metro-North's negligence claim against Ducci, however, falls under the *Ferryman*[8] exception to the Act and is therefore not barred by the statute.

As a general rule, employers "shall not be liable for any action for damages on account of personal injury sustained by an employee arising out of and in the course of his employment . . . ." Connecticut General Statutes § 31-284 (a) (also known as the "exclusive-remedy clause"). The Connecticut Supreme Court, however, created an exception to this rule allowing plaintiffs in third-party actions to seek indemnification from an injured worker's employer when certain conditions are met. *Ferryman v. Groton*, 212 Conn. 138 (1989). Such a third-party action will be permitted if (1) the third-party tortfeasor and the employer have a relationship independent of the employer-worker relationship and (2) the employer breached an independent duty to the third party. *Id.*, at 144-45.

---

[7] Connecticut General Statutes § 31-275 et. seq. is also known as the "Workers' Compensation Act."

[8] *Ferryman v. Groton*, 212 Conn. 138 (1989).

In this case, there is no question that Metro-North and Ducci had an independent legal relationship based on the March 31, 1997 contract in which Ducci agreed to perform electrical work in Metro-North territory. Ducci does not contest the fact that the contract between Ducci and the Connecticut Department of Transportation ("CDOT") was indirectly a contract with Metro-North.[9] (Ducci's Mem. of Law, p. 1) ("[Ducci] has complied with all relevant and material terms of its *contract with Metro-North*. . . " (emphasis added). The first *Ferryman* requirement is satisfied, therefore, without contest.

In addition, there is ample evidence that the second *Ferryman* requirement is satisfied because Ducci owed and breached an independent duty to Metro-North. After performance under the contract had begun, Ducci and Metro-North agreed to amend the terms of the MN-290, Metro-North's own electrical operations manual.[10] Because Ducci was concerned that a strict adherence to the procedures contained in the MN-290 would cause unnecessary delays and cost Ducci the opportunity to receive bonuses under the contract, the parties agreed to re-distribute the responsibilities of the Metro-North Class A Lineman as outlined in the MN-290. (See Ex. 6, pp. 90-93). Moreover, the training materials provided to Ducci during the Project demonstrate that

---

[9] The March 31, 1997 contract between Ducci and CDOT was a secondary contract directly linked to the primary contract entered into with regard to the New Haven reconfiguration project. The primary contract was titled "Agreement Between CT Dept. of Transportation and National Railroad Passenger Corporation For Construction of New Haven Interlocking Reconfiguration at New Haven, CT," and was dated May 31, 1996.

[10] The MN-290 is Metro-North's Rules for the Power Department.

the MN-290 was altered and, when these documents are compared with the MN-290, it is apparent that several of the duties of Metro-North's Class A Lineman became the responsibility of the Ducci foreman. (See Ex. 10, Metro-North MN-290 Orientation for Contract Lineman). Metro-North provided Class A protection only to non-qualified Ducci employees, or those who were not certified journeymen linemen and who had not completed a Power class and received a blue sticker. (See Ex. 6, pp. 86, 89). This protection was provided at Ducci's request to those non-qualified employees who needed to work closer than 10 feet to energized line. Traditionally, Metro-North provided Class A protection to all contractors and non-qualified employees requiring them to stay 10 feet away from energized wires while working on Metro-North property. (See Ex. 6, p. 90). Under this policy, a Class A Lineman would obtain the clearance at Ducci's request and explain the clearance limits but would not be responsible to monitor the activities of the qualified contractors. Ducci was supposed to develop an internal clearance procedure whereby they would police their own employees to ensure that they understand the clearance limits and the release of power back to Metro-North. (See Ex. 6, pp. 94-95).

In its memorandum of law, Ducci fails to disclose the parties' agreement to alter the terms of the MN-290 when discussing the second *Ferryman* requirement. Ducci instead argues that the only duty owed to Metro-North was a duty to perform the contract in a "workman-like manner," which, on its own, is insufficient to trigger the *Ferryman* exception. As set forth above, Ducci owed and breached several *specific* duties to Metro-North; not just a general duty to

perform under the contract in a workman-like manner. It would simply be illogical to conclude that Ducci took on several of Metro-North's responsibilities in an attempt to further its own interests yet avoided all responsibilities that went along with them. Because it is uncontroverted that an independent relationship exists between the parties, and because Metro-North has provided substantial evidence that Ducci breached an independent duty owed to Metro-North, summary judgment on this cause of action is not appropriate.

### 2. Contribution

Ducci next argues that because Metro-North's negligence action against Ducci is barred by the exclusive-remedy clause of the Workers' Compensation Act, its claim for contribution is barred by the Act as well. As set forth in subsection B (1) above, Metro-North's negligence action is valid based on the *Ferryman* exception to the statutory rule. Accordingly, Metro-North's claim for contribution is permissible under that exception as well for all the reasons set forth in subsection B (1).

### C. Ducci's negligence was the cause of plaintiff's injury

Ducci contends in its motion for summary judgment that "even if the exclusivity provision [of the Workers' Compensation Act] does not apply, Ducci cannot be said to have acted negligently." (Ducci's motion, p. 2). Although Ducci raises this argument in its motion, it does not address this issue in its corresponding memorandum of law. There is ample evidence that Ducci acted negligently and, therefore, Metro-North will respond to Ducci's bald assertion.

On July 22, 1999, plaintiff, Michael Gargano, was **not** a certified journeyman lineman and therefore **not** a qualified contractor permitted to work under the 3 foot clearance rule. (See Ex. 4, DiStasio Letter). Notwithstanding that Mr. Gargano was not a certified journeyman lineman, he was nevertheless wearing a blue sticker on his helmet indicating to Metro-North field personnel that he was a qualified contractor. (See Ducci Ex. M, p. 85)  Plaintiff testified that he was personally advised by Morse sometime between 3:00 and 3:30 p.m that Tracks 1 and 2 were going to be re-energized and that he needed to "clear up." (See Ex. A, p. 107). Plaintiff testified that he was never asked to sign Ducci's Grounding Notification/Clearance Form by Mr. Morse regarding the electrical clearances on Tracks 1 and 2. (See Ex. A, pp. 99-100). In direct contradiction to Ducci's agreement with Metro-North, Mr. Morse testified that he did not require Ducci contractors to sign the Ducci Grounding Notification/Clearance Form. (See Ex. 7, pp. 67-68). Plaintiff testified that he advised Morse that he was going to go back up and work on the 42 crossover. Morse allegedly said "okay" and left the area. (See Ex. A, pp. 120-121).  At 3:31 p.m. Morse signed off on Metro-North's MP-260 form acknowledging that he understood that Tracks 1 and 2 were to be energized and confirming that all Ducci contractors were clear. (See Exhibits 8 and 9). Ducci and its Foreman Phil Morse clearly breached its duty to Metro-North by allowing a non-qualified contractor to work within 3 feet of electrified wire and allowed plaintiff to wear a blue sticker that signified to Metro-North field personnel that he was qualified. Moreover, Morse' release of the clearance back to Metro-North and his signature on the MP-260 form

representing that all his employees were clear was an obvious breach of Ducci's duty to Metro-North.

## III. CONCLUSION

For the foregoing reasons, Metro-North respectfully requests that this Court deny Ducci's Motion for Summary Judgment because Ducci relies on inapplicable law and ignores critical issues of material fact.

DEFENDANT/THIRD PARTY<br>
PLAINTIFF, METRO-NORTH<br>
COMMUTER RAILROAD COMPANY<br><br>
BY: _____<br>
Sean M. Kane (CT 24832)<br>
Landman Corsi Ballaine & Ford, PC<br>
120 Broadway, 27th Floor<br>
New York, NY 10271-0079<br>
(212) 238-4800

## CERTIFICATION

I hereby certify that a copy of the foregoing was mailed, postage prepaid, on the 12th day of October, 2004, to all counsel and pro se parties of record as follows:

David J. Crotta, Jr., Esq.
Mulvey, Oliver, Gould & Crotta
83 Trumbull Street
New Haven, CT 06511

Eric P. Smith, Esq.
Steven J. Errante, Esq.
Lynch, Traub, Keefe & Errante
52 Trumbull Street
P.O. Box 1612
New Haven, CT 06506

David D. Chapman, Esq.
Genovese, Vehslage & LaRose
500 Enterprise Drive
Rocky Hill, CT 06067-4053

Julie A. Harris, Esq.
Law Offices of George J. DuBorg
200 Glastonbury Blvd., Suite 301
Glastonbury, CT 06033

Joseph A. Labella, Esq.
D'Attelo & Shields
500 Enterprise Drive, Suite 4B
Rocky Hill, CT 06067

Sean M. Kane (CT 24832)

379928.1 DocsNY